**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

CHARLES DALE CONNER,

    Plaintiff,

vs.                                              No. 10-CV-512 WJ/WDS

ALEX RODRIGUEZ and
STATE OF NEW MEXICO DEP'T OF
PUBLIC SAFETY,

    Defendants.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Plaintiff Charles Dale Conner's Motion for Partial Summary Judgment (**doc. 59**), filed May 18, 2011, and Defendant Alex Rodriguez's Motion for Summary Judgment (Qualified Immunity) (**doc. 92**), filed August 19, 2011.  In this civil action brought under 42 U.S.C. § 1983, Plaintiff alleges that Defendant violated Plaintiff's Fourth Amendment rights under the United States Constitution to be free from unreasonable searches and seizures.  Specifically, Plaintiff claims that Defendant used excessive force in effecting Plaintiff's arrest.  Each party argues that there are no disputes of material fact and that each party is entitled to summary judgment.  The Court finds that Defendant's motion is well-taken and shall be **GRANTED**, while Plaintiff's shall be **DENIED**.

**Background**

**I. Procedural History**

Plaintiff filed this case in Federal Court on May 27, 2010, alleging five claims:

Count I: excessive force in violation of the Fourth Amendment against Defendant Rodriguez;

Count II: assault and battery under the New Mexico Tort Claims Act against Defendant Rodriguez;

Count III: municipal liability asserted against Defendant State of New Mexico Department of Public Safety ("DPS") for violations of the Tort Claims Act;

Count IV: municipal liability asserted against Defendant DPS under § 1983; and

Count V: liability of DPS based on *respondeat superior*.

The Court previously granted Defendant New Mexico Department of Public Safety's ("DPS") motion to dismiss Count IV of the Complaint based on immunity from suit under the Eleventh Amendment. (Doc. 20.) Thereafter, the Court granted both Defendants' Motion to Dismiss Counts II, III, and V of the Complaint for related sovereign immunity bars to suit. (Doc. 91.) Therefore, the only remaining claim in this case is Count I for excessive force under the Fourth Amendment against Defendant Rodriguez.[1] It is this remaining claim which is the subject of the parties' cross-motions for summary judgment.

**II. Factual Background**

On the evening of February 5th, and continuing into the early morning of February 6th, 2009, Plaintiff, through a series of misguided actions and criminal conduct, made himself the subject of a high-speed police chase in Southern Colorado that ended in New Mexico. When the Colorado officers pursuing Plaintiff realized that he would be driving into New Mexico, they

---

[1] Since Defendant Rodriguez is the only remaining viable Defendant, the Court will not require changing the header of the case. It will refer to Defendant Rodriguez as "Defendant," and make no further mention of Defendant DPS as a defendant.

requested assistance from the New Mexico State Police in setting up a roadblock and apprehending Plaintiff.  Defendant was one of the New Mexico State Police officers who responded to this request.[2]  That evening, Defendant was on duty wearing his uniform and driving a marked New Mexico State Police vehicle.

While en-route to intercept Plaintiff, Defendant learned from his police dispatcher that Plaintiff was driving erratically at a high rate of speed towards the Colorado/New Mexico border with nine to twelve Colorado law enforcement officers in pursuit; that Plaintiff has a history of mental illness and was armed with knives; that there was an outstanding warrant for Plaintiff's arrest; that earlier that evening Plaintiff had rammed two police vehicles in Colorado with shots being fired at Plaintiff by Colorado officers; and that Plaintiff was drinking beer and tossing the empty cans out of his vehicle.

The Colorado officers requested that Defendant and the other New Mexico officers set up spike strips to puncture Plaintiff's tires and thereafter take over the pursuit.  Officer Lucero's in-car video documents the events from the time Plaintiff crossed the spike strips until the time when, after a face-to-face confrontation, Defendant discharged his shotgun at Plaintiff and wounded him in the shoulder.  These events in New Mexico between Plaintiff and Defendant occurred over a time period of approximately 5 ½ minutes.

When Plaintiff's vehicle initially encountered the spike strips placed on the road by Defendant and the other officers, one of Plaintiff's tires became shredded; however, Plaintiff's vehicle continued to drive for several miles on the metal rim of the wheel. When Plaintiff's

---

[2]One of Defendant's fellow officers, Officer Lucero, was recording the incident on his in-vehicle video camera; this video captures the essential events, and contains audio from the Defendant's belt tape.  While other officers are heard on the audio, the primary voice is that of Defendant.  (Doc. 59 at 2; doc. 93 at 2; *see* doc. 59, ex. C.)

vehicle veered off the road and came to a stop, Defendant and other officers identified themselves as New Mexico State Police officers and repeatedly ordered Plaintiff to show them his hands. Plaintiff did not comply and instead sat in the driver's seat moving somewhat erratically. According to Defendant, Plaintiff then ducked down towards the passenger seat in a manner that Defendant perceived to be threatening in that Plaintiff could have been reaching for a weapon. The audio recording has Defendant stating: "hold on, hold on, hold on, he just ducked, he just ducked." (Doc. 59 ex. C at time-stamp 46:26.) Defendant then called out "bean bag" and fired his weapon striking Plaintiff in the shoulder.

Plaintiff contends there is a disputed issue of material fact in that according to Plaintiff, he disputes that he ducked towards the passenger seat or that he moved at all during the confrontation. (*See* doc. 95 at 7; doc. 95 ex. B at 100–02.) However, Officer Lucero's dash cam recorder and Defendant's belt tape recording discredit Plaintiff's assertion that he was lying passively and unconscious during the entire confrontation with Defendant and the other New Mexico officers. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.") In the video, Defendant can be heard to say "hold on, hold on, hold on, he just ducked, he just ducked," which refrain is echoed by the other officers present at the scene. The officers can be seen in the video backing up from Plaintiff's vehicle. It strains credulity to imagine that all of the police officers spontaneously fabricated this movement away from Plaintiff's vehicle while Plaintiff was lying passively and unconscious across the seat in his vehicle. Therefore, the video and audio evidence clearly contradicts Plaintiff's assertion that he was lying passively and unconscious across the seat of his vehicle and the Court will not give

credence to this particular assertion.

While Defendant yelled out "bean bag" and then discharged his weapon, what struck Plaintiff in the shoulder was not a "bean bag" projectile, but rather was buckshot discharged from the 12-gauge shotgun issued to Defendant.  Prior to the incident in question, the DPS issued Defendant two Remington model 870 12 gauge shotguns.  The one shotgun considered to be "lethal" fires 12-gauge shells filled with buckshot and the other shotgun considered to be "less-lethal" fires "bean-bag" rounds.  Additionally, while the two shotguns were Remington Model 870's, the bean-bag shotgun was marked with yellow tape on the barrel and on the stock, the bean-bag rounds were white and the bean-bag shotgun had a synthetic stock.  In contrast, the lethal shotgun had a wooden stock and the shells were red and displayed in a holder on the outside of the stock.

The uncontroverted evidence establishes that while Defendant ordinarily stored his less-lethal shotgun in the trunk of his vehicle and the lethal shotgun beside the front seat, on this particular occasion Defendant's lethal shotgun was in the trunk of his police cruiser with his other equipment because Defendant was involved in an earlier mission.  Defendant left the lethal shotgun in the trunk so that it would be secured over the long weekend and simply forgot to move it back to its normal position.  The less-lethal shotgun was also in the trunk, covered up by other equipment.

Immediately prior to Defendant's confrontation with Plaintiff, Defendant accidentally removed his lethal shotgun from the trunk believing he had grabbed his less-lethal shotgun. Defendant stated that he was wearing gloves and could not feel the difference in texture between the stock of the lethal shotgun and the stock of the less-lethal shotgun.  Moreover, the incident in question occurred at night so Defendant did not see that he had picked up the wrong shotgun.

During the face-to-face encounter with Plaintiff, Defendant intended to use his less-lethal shotgun.  After shooting Plaintiff with the lethal shotgun, Defendant expressed surprise and consternation that he had discharged a lethal-type round, as evidenced by the dash-cam  and belt recorders.

These facts are not disputed, and the Court finds that they provide a sufficient basis to decide the legal questions presented by the parties' cross-motions for summary judgment.

## Legal Standard

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; it may not rest on mere allegations or denials in its own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986).  In order to avoid summary judgment, the non-moving party must put forth enough evidence that a reasonable jury could return a verdict in the non-movant's favor. *Id.* at 249.  A mere scintilla of evidence in the non-movant's favor is not sufficient. *Id.* at 252.  Analysis of a summary judgment motion requires that the court consider all the evidence in the light most favorable to the nonmoving party.  *Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

When parties file cross-motions for summary judgment in which they both allege the absence of disputed material facts, it is proper for the Court to consider and rule on the legal issues presented.  In such a case, the Court should award summary judgment to the party which

6

is entitled to judgment as a matter of law in light of the undisputed facts.  *O'Connor v. Check Rite, LTD*, 973 F.Supp. 1010 (D.Colo. 1997); *Spring Spectrm. L.P. v. Board of County Commissioners of Jefferson County, Colo.*, 59 F.Supp. 2d 1101 (D.Colo. 1999); *Schmidt v. Farm Credit Svs.*, 977 F.2d 511 (10th Cir. 1992)

## Discussion

The United States Supreme Court has defined the doctrine of qualified immunity as follows:

> The general rule of qualified immunity is intended to provide government officials with the ability "reasonably [to] anticipate when their conduct may give rise to liability for damages."   Where that rule is applicable, officials can know that they will not be held personally liable as long as their actions are reasonable in light of current American law. That security would be utterly defeated if officials were unable to determine whether they were protected by the rule without entangling themselves in the vagaries of the English and American common law.

*Anderson v. Creighton*, 483 U.S. 635, 646 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)) (alteration in original).  In other words, "[a]s the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Qualified immunity is a recognition of "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority," with the result that "officials will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *Butz v. Economou*, 438 U.S. 478, 506–07 (1978).

In addressing whether Defendant is entitled to qualified immunity, the Court is further guided by Tenth Circuit precedent:

> In an action under section 1983, individual defendants are entitled to qualified immunity unless it is demonstrated that their alleged conduct violated clearly

> established constitutional rights of which a reasonable person in their positions would have known. Once a defendant has raised qualified immunity as an affirmative defense, the plaintiff bears the heavy two-part burden of demonstrating that (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged conduct.

*Brooks v. Gaenzle*, 614 F.3d 1213, 1219 (10th Cir. 2010) (quoting *Reeves v. Churchich*, 484 F.3d 1244, 1250 (10th Cir. 2007)) (internal quotation marks and citations omitted).  The order of addressing these two prongs is left to courts' discretion, *see Pearson v. Callahan*, 555 U.S. 223 (2009).  In the instant case, the Court first addresses whether the law was clearly established at the time of the alleged violation.

**I.  "Clearly Established" Analysis**

*A. Level of Factual Specificity*

The qualified immunity analysis requires that the Court measure the particular facts in this case against existing law to decide whether Defendant could have known that his actions violated Plaintiff's constitutional rights, and so the first task before the Court is to define the appropriate level of specificity in the facts against which to measure the clarity of legal precedent.  As the Tenth Circuit has noted:

> striking the right balance is crucial to the qualified immunity analysis.  Too general a formulation would convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.  On the other hand, defining the constitutional right too narrowly would render the defense available to all public officials except in those rare cases in which a precedential case existed which was on all fours factually with the case at bar.

*Boles v. Neet*, 486 F.3d 1177, 1183–84 (10th Cir. 2007) (internal quotations omitted).  The desired end-state is simple: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

In this regard, the Tenth Circuit has "adopted a sliding scale to determine when law is

clearly established. 'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)). In this case, the sliding scale leans towards specificity because Defendant's conduct, while sloppy and negligent, was not egregious or reckless under the circumstamces. Taking the above guidance into account, striking the right balance in this case will require consideration of a relatively specific level; the facts in this case are unique and the proper legal analysis cannot ignore their unusual character. The Court finds the appropriate level of specificity in the factual scenario to be:

> Defendant intended to seize Plaintiff, through the ordinary effects of an admittedly appropriate level of force. Instead, due to a completely inadvertent—but perhaps negligent[3]—mistake, Defendant used a more serious type of force, which, if not clearly inappropriate,[4] was at least arguably excessive.

---

[3]The Court notes, in passing, that the acts of (1) placing the lethal shotgun in the trunk, (2) failing to take the lethal shotgun out of the trunk, and (3) failing to check which shotgun Defendant was holding, while perhaps negligent when taken together, cannot constitute reckless conduct.

[4]The encounter between Defendant and Plaintiff lasted only five minutes and thirty seven seconds; the confrontation at Plaintiff's truck itself lasted only fifty seconds. The situation, during this brief interval could only be described as "rapidly evolving." It is filled with speeding vehicles, sparks flying from tire-less rims, disregard of police commands, and erratic movements within a dimly lit vehicle.
 Before the confrontation, Defendant knew that Plaintiff (1) had led officers on a dangerous, high-speed chase, (2) had repeatedly refused to obey commands by police, (3) was armed at least with large knives, (4) was mentally unstable, (5) had been drinking, (6) had assaulted Colorado officers with his vehicle resulting in Colorado officers using deadly force in an attempt to apprehend Plaintiff, (7) had driven for miles on the metal rim of one of his tires, and (8) had refused multiple orders by police officers to show them his hands, commands oriented towards controlling the threat that he posed to the officers during the arrest. When, on top of all this, Plaintiff ducked suddenly as if reaching for a weapon, the Court believes that if Defendant had intended to use deadly force, such a use of deadly force under these circumstances may have been entirely appropriate.

9

No more general description of the facts would serve to convey the situation with requisite accuracy. Common sense leads to the conclusion that accidental actions are significantly different from intentional ones, and that a partial accident is different from a complete accident. So describing the situation generally as either an ordinary police shooting, or as a completely accidental occurrence would not suffice to give a reasonable official notice of the contours of the right in question.[5]

Having defined the factual scenario, the Court must now consider whether a reasonable official would have known that such actions violate Plaintiff's constitutional rights. Plaintiff has the burden to show that the law was clearly established. However, a discussion of relevant case law is severely lacking in Plaintiff's submissions. Plaintiff has treated the legal questions as an ordinary excessive force analysis and has not acknowledged the singular nature of the facts of this case. Therefore, few if any of Plaintiff's arguments and case citations address the question of whether negligent police conduct can support a Fourth Amendment violation.

Nevertheless, the Court has conducted a brief survey of the law, in order to determine whether Defendant had notice that his conduct violated Plaintiff's rights.

*B. Supreme Court Precedent*

The Court begins with a survey of applicable precedent from the United States Supreme

---

[5]The parties expend a significant amount of effort arguing whether Defendant's intent is relevant to the inquiry. As a general proposition, of course, it is clearly established law that the Fourth Amendment reasonableness inquiry is objective, and does not involve consideration of an officer's subjective intent. *See, e.g.*, *Tanberg v. Sholtis*, 401 F.3d 1151, 1168 (10th Cir. 2005). However, it is the officer's *motivation*, not his *volition*, which is irrelevant to the inquiry. *See id.* Without this distinction, the Court's analysis of intent in *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989), as discussed below, would be difficult to explain. Therefore, while Defendant's subjective motivations are certainly irrelevant to the current inquiry, the volitional or non-volitional nature of his actions is extremely relevant.

Court.  The Supreme Court has clearly stated, in a different but parallel context, that negligence by state officials resulting in injuries does not rise to the level of a constitutional violation.  In *Daniels v. Williams*, 474 U.S. 327 (1986), the Court addressed a negligence claim in the context of the Fourteenth Amendment due process clause.  After evaluating the nature and purpose of the due process right, and finding that at its core, constitutional due process is "intended to secure the individual from the arbitrary exercise of the powers of government," *id.* at 331 (citations omitted), the Court stated:

> Far from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law. . . . [W]e bear in mind Chief Justice Marshall's admonition that "we must never forget, that it is a constitution we are expounding."  Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society.

*Id.* at 332 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819)).  This exclusion of negligence from the Constitution seems unequivocal and broad; and while of course it does not apply directly to the Fourth Amendment, it is worth noting that prior to *Graham v. Connor*, 490 U.S. 386 (1989), the Tenth Circuit commonly reviewed excessive force claims such as Plaintiff's under the due process standard.  *See Dixon v. Richer*, 922 F.2d 1456, 1461 (10th Cir. 1991).

In the Fourth Amendment context, while the Supreme Court has not explicitly foreclosed the possibility of supporting an excessive force claim with negligent police conduct, the Court has opined on the nature of a Fourth Amendment seizure:

> Thus, if a parked and unoccupied police car slips its brake and pins a passerby against a wall, it is likely that a tort has occurred, but not a violation of the Fourth Amendment. And the situation would not change if the passerby happened, by

11

> lucky chance, to be a serial murderer for whom there was an outstanding arrest warrant—even if, at the time he was thus pinned, he was in the process of running away from two pursuing constables. It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement through means intentionally applied. That is the reason there was no seizure in the hypothetical situation that concerned the Court of Appeals. The pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means—his loss of control of his vehicle and the subsequent crash. If, instead of that, the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.

*Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989).  This passage follows an analysis of the nature and purpose of the Fourth Amendment, and the conclusion that "the Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct."  *Id.* at 596 (quoting *Byars v. United States*, 273 U.S. 28, 33 (1927)).  There is conceptual similarity here with the Court's analysis of constitutional due process in *Daniels*: and thus perhaps, like due process, the right to be free from unreasonable searches and seizures does not "supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."  *Daniels*, 474 U.S. at 332.

Indeed, such language might seem to foreclose negligence as a basis for a Fourth Amendment claim; however, in an intriguing passage, the Court says that it does not intend to

> draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result. It was enough here, therefore, that, according to the allegations of the complaint, Brower was meant to be stopped by the physical obstacle of the roadblock—and that he was so stopped.

*Brower*, 489 U.S. at 598–99. "Accidental discharge"—this language is eerily similar to the situation at hand. By refraining to "draw too fine a line," it is likely that the Supreme Court has left the sort of factual scenario in this case to be resolved at a future time.

Supreme Court precedent requires that a seizure be affected through means intentionally applied, and it gives the following factual scenarios for comparison: a car accidentally slips its brake and pins a pursued felon (not a seizure); a pursuing officer attempts to seize with a show of force, and the fleeing felon loses control of his car and crashes (not a seizure); a roadblock intended to stop by show of force in fact stops by physical force (a seizure); an officer bludgeons a felon with his pistol and accidentally discharges the pistol hitting the felon (a seizure); an officer intends to shoot a felon in the leg and accidentally shoots him in the heart (a seizure). To the extent that a principle can be deduced here, it appears to be that if an officer intends to seize a felon using a certain means, the felon is seized even if the ordinary effects of those means have a higher than intended impact on the felon; while if the officer intends to seize a felon through one means, and the felon is actually seized by a different, unintended means, no seizure occurs.

Even in light of this tentative principle, the current factual scenario is on the borderline. It seems that Defendant and the DPS treated the lethal shotgun and the less-lethal shotgun as two different types of weapon; in which case, if Defendant intended to use one means—a less-lethal bean bag round from a less-lethal shotgun—and inadvertently used a different type of means—a buckshot round from a lethal shotgun—then the situation is more analogous to an officer who is attempting to seize a felon through pursuit and a show of force, but whose vehicle accidentally slips its brake and pins the felon.

This resolution is by no means clear. Perhaps the present situation is more analogous to the Court's other examples, or perhaps the Supreme Court was intending to establish a different

principle. But, for present purposes, it is enough to conclude that *Brower* does not establish clearly that Defendant violated Plaintiff's rights. Therefore, because the Supreme Court has not definitively defined the contours of the question in enough detail to give Defendant notice that his conduct violated Plaintiff's Fourth Amendment rights, the Court next turns to Tenth Circuit law.

*C. Tenth Circuit Precedent*

The Tenth Circuit has not squarely addressed the situation of an unintentional or accidental application of force during an arrest. At most, the circuit has touched obliquely on the applicable law.

In *Medina v. Cram*, 252 F.3d 1124 (10th Cir. 2001), the Tenth Circuit addressed a situation where police conduct arguably caused the need for the use of a higher level of force than would otherwise have been necessary. The court held that "in order to constitute excessive force, the conduct arguably creating the need for force must be immediately connected with the seizure and must rise to the level of recklessness, rather than negligence." *Id.* at 1132.

While not precisely on point, there is a certain logical similarity: in this case Defendant mistook his weapon, and that mistake resulted in the use of lethal force rather than less-lethal force. If the comparison holds merit, it seems to suggest that, barring conduct rising to recklessness, negligent police conduct like Defendant's would not suffice to support a constitutional violation in the Tenth Circuit.

The relevance seems greater in light of the fact that the *Medina* court cited to *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995), footnote 7, which reads:

> Mere negligent actions precipitating a confrontation would not, of course, be actionable under § 1983. *See Daniels v. Williams*, 474 U.S. 327, 331–33, 106 S.Ct. 662, 664–66, 88 L.Ed.2d 662 (1986) (stating that "injuries inflicted by

> governmental negligence are not addressed by the United States Constitution" and rejecting § 1983 claim based on alleged due process violation); *Yates v. City of Cleveland*, 941 F.2d 444, 447 (6th Cir.1991) (holding that "mere negligence may not serve as a basis for a section 1983 claim," but concluding that officer's actions causing need to use deadly force were "more than merely negligent").

*Sevier* was a Fourth Amendment excessive force case addressing the same issue as *Medina*: whether police conduct contributing to the use of force can be grounds for an excessive force claim. I find it instructive that, in addressing a Fourth Amendment excessive force claim, the Tenth Circuit cited *Daniels* for the proposition that police negligence cannot serve as a basis for a § 1983 claim.

The Tenth Circuit has also compared excessive force claims under the Fourth Amendment to intentional torts, citing *Brower* for the broad proposition that intent is required. *Oliveros v. Mitchell*, 449 F.3d 1091, 1095 (10th Cir. 2006) ("Plaintiff's § 1983 claims are premised on defendants' excessive use of force and unreasonable seizure of Blouin in violation of his Fourth Amendment rights. The Supreme Court has held that such claims are necessarily predicated on intentional conduct.") (citing *Brower*, 489 U.S. at 597).

None of these Tenth Circuit cases would put Defendant on notice that his conduct violated Plaintiff's Fourth Amendment rights; if anything, they seem to hint that the Tenth Circuit would not find that unintentional police conduct violates the Fourth Amendment. Therefore the inquiry must continue.

The Tenth Circuit allows recourse to cases from other circuits in order to show that "the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1228 (10th Cir. 2001) (quoting *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir.1992)) (alteration in original). Therefore the Court will conduct a brief survey into cases from other circuits in order

to determine whether the clearly established weight of authority would give Defendant notice that his actions violated Plaintiff's rights.

### D. Precedent from Other Circuits

Other circuits have addressed mistakes and negligence by police officers under the Fourth Amendment excessive force standard. Most cases stand for the proposition that police negligence does not give rise to a Fourth Amendment excessive force claim. *See McCoy v. City of Monticello*, 342 F.3d 842 (8th Cir. 2003) (granting qualified immunity to officer who accidentally fired pistol when he slipped on ice after applying reasonableness standard only to non-accidental action of drawing weapon); *Evans v. Hightower*, 117 F.3d 1318, 1321 (11th Cir. 1997) ("This record shows only that Mathis was negligent and is devoid of any evidence that Mathis intended that Hightower's car strike Evans. Therefore, Mathis is entitled to qualified immunity."); *Sturges v. Matthews*, 53 F.3d 659, 661 (4th Cir. 1995) (approving jury instruction on excessive force claim reading: "if the injury and death in this case is found based upon a preponderance of the evidence to have resulted ... from an accident or from an unknowing act, then, of course, there would be no violation"); *Ansley v. Heinrich*, 925 F.2d 1339 (11th Cir. 1991) (same); *Campbell v. White*, 916 F.2d 421, 423 (7th Cir. 1990) (holding that accident during police chase was not "means intentionally applied"); *Pleasant v. Zamieski*, 895 F.2d 272, 276–77 (6th Cir. 1990) (applying Fourth Amendment reasonableness analysis in accidental shooting case only to volitional acts of officer first to unholster and second not to reholster weapon); *Dodd v. City of Norwich*, 827 F.2d 1, 7–8 (2nd Cir. 1987) (on reargument), cert. denied, 484 U.S. 1007 (1988) ("If such a standard were applied, it could result in a fourth amendment violation based on simple negligence. The fourth amendment, however, only protects individuals against 'unreasonable' seizures, not seizures conducted in a 'negligent'

16

manner."); *but see Villanova v. Abrams*, 972 F.2d 792, 796 (7th Cir. 1992) (equating the "reasonableness" standard of Fourth Amendment law with the common law negligence standard).[6]

The general weight of the caselaw from other circuits seems to lean heavily towards the proposition that negligent conduct alone can not be a basis for Fourth Amendment liability. Two recent cases appear to cut the other way, and they are of particular interest because they involve strikingly similar facts to those in the present case. However, the Court finds that they do not suffice to show that the clear weight of authority is in agreement with them.

The two cases that present similar facts are the Fourth Circuit case of *Henry v. Purnell* and the Ninth Circuit case of *Torres v. City of Madera*. Both addressed situations where police

---

[6]Numerous district courts have also addressed the question, with the majority concluding that police negligence cannot support a constitutional claim. *See Brice v. City of York*, 528 F.Supp.2d 504 (M.D.Pa. 2007) (holding that accidental discharge of officer's weapon during arrest cannot support an excessive force claim); *Owl v. Robertson*, 79 F.Supp.2d 1104, 1114 (D.Neb.2000) ("On the other hand, if the shooting was truly accidental, then there was no violation of Owl's Fourth Amendment rights since the act of drawing the weapon and the act of forcing Owl to the ground were not, for the reasons given earlier, excessive under the Fourth Amendment."); *Clark v. Buchko*, 936 F.Supp. 212, 220 (D.N.J 1996) (holding, in accidental shooting case, that where "plaintiffs acknowledge that Buchko did not commit a volitional act in firing the gun . . . plaintiffs cannot maintain a Fourth Amendment claim"); *Troublefield v. City of Harrisburg, Bureau of Police*, 789 F.Supp. 160, 166 (M.D.Pa. 1992), aff'd 980 F.2d 724 (3d Cir.1992) ("This court is likewise persuaded that the language of *Brower* . . . requires that some nature of volitional act on the part of the state actor must cause the harm to plaintiff for a fourth amendment excessive force claim to sound. Negligence in pulling out a firearm or in reholstering it is not sufficient in this court's view."); *Glasco v. Ballard*, 768 F.Supp. 176, 180 (E.D.Va. 1991) ("[A] more appropriate understanding of the case law, as well as the history of the Fourth Amendment, suggests that a wholly accidental shooting is not a "seizure" within the meaning of the Fourth Amendment."); *Matthews v. City of Atlanta*, 699 F.Supp. 1552, 1556 (N.D.Ga. 1988) ("Here, because there is no evidence that the officer intended to shoot the plaintiff's decedent or that he did so volitionally, the shooting does not constitute a seizure within the meaning of the fourth amendment."); *but see Johnson v. City of Milwaukee*, 41 F.Supp.2d 917 (E.D.Wis. 1999) (rejecting argument that "accidental shootings as a matter of law do not implicate the Fourth Amendment").

17

officers mistakenly drew their service pistols instead of their tasers, and used deadly force on plaintiffs rather than the less-lethal force of their tasers.

In the first case, *Henry v. Purnell*, 501 F.3d 374 (4th Cir. 2007), an officer chasing plaintiff in an effort to arrest him accidentally drew his service pistol instead of his taser, both of which were holstered on the same side of the officer's belt. The court reasoned that because the officer intended generally to shoot plaintiff with a taser, the volitional requirement of *Brower* was satisfied. *Id.* at 381–82.

The second case, *Torres v. City of Madera*, 524 F.3d 1053 (9th Cir. 2008), involved a situation where an officer shot a plaintiff who was already handcuffed and secured in the back of the police car. Because the plaintiff was already seized, the court avoided the question of whether the unintended use of a pistol would suffice to create a Fourth Amendment seizure under *Brower*, but went on to apply a reasonableness standard to the officer's conduct.[7] In so holding, the court reversed the district court holding that "[a] Fourth Amendment seizure . . . occur[s] . . . only when there is a governmental termination of freedom of movement through means intentionally applied," and that "the means or instrumentality at issue is the intent to seize Everardo with the [Taser] versus the Glock and not the general intent to seize Everardo by shooting 'something.'" *Id.* at 1055 (alterations and omissions in original).[8]

---

[7]While the court did not decide whether the conduct at issue could itself be a seizure, applying the reasonableness standard to a negligent action is an acknowledgment that negligence can potentially violate the Fourth Amendment; and so the Court considers this outcome, to the extent it resolves the question at all, to be contrary to the weight of the caselaw.

[8]In attempting to evaluate whether the *Henry* and *Torres* cases would give Defendant adequate notice that the clear weight of authority held that his negligence could subject him to personal liability under the Fourth Amendment, the Court notes that the progress of these lines of cases belies the idea that the law is clear and well established. Subsequent decisions, while not strictly relevant to the qualified immunity inquiry because they were handed down after the

After evaluating the *Henry* and *Torres* cases, the Court acknowledges that the Fourth and Ninth Circuits have concluded that conduct similar to Defendant's could potentially violate the Fourth Amendment.  However, these two circuit decisions do not suffice to clearly establish that Defendant's conduct violated Plaintiff's Fourth Amendment rights.[9]  These two cases do not suffice to show that "the clearly established weight of authority from other courts" agrees with them.  *Camfield*, 248 F.3d at 1228.  Instead, if there is any weight of authority, it appears still to lean in the opposite direction: that unintentional negligent conduct cannot establish a Fourth Amendment claim.

The Court finds this result amenable to the purposes of qualified immunity.  In light of the public interest of having officials who are free to vigorously carry out their duties without the

---

events in this case took place, are of some interest.  A subsequent Fourth Circuit panel granted the officer qualified immunity in *Henry v. Purnell*, 619 F.3d 323 (4th Cir. 2010), because it felt that the law was not clearly established as to the mistaken use of a pistol instead of a taser; and the *en banc* circuit court reversed the grant of summary judgment in *Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) (en banc).  Similarly, on remand the district court in *Torres v. City of Madera*, 655 F.Supp.2d 1109 (E.D.Cal. 2009), granted the officer qualified immunity because it was not clearly established that accidental use of a pistol instead of a taser violated the Fourth Amendment, and the circuit court reversed in *Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011).  Both the *Purnell* and the *Torres* cases are currently awaiting a grant of *certiorari*.  The Court finds it instructive that factual scenarios similar to this case have spawned widely disparate applications and disagreement about the Fourth Amendment law involved which further bolsters the notion that the law is far from being well established in this area.

[9]As an additional, and purely factual matter, the Court notes that the mistake made by Defendant and those of the officers in *Purnell* and *Torres* are not entirely equivalent.  Tasers and pistols, as the circuit courts observed, have significant shape, feel, and operational differences; Defendant's two shotguns were the same model of Remington shotguns, and functioned in the exact same way.  In the other two cases, neither situation was particularly high-stress or dangerous, while Defendant was involved in a high-speed chase with a felon who had already been shot by police, had assaulted police officers with his vehicle, and was known to be armed and to have a mental imbalance.  Thus even if the Fourth and Ninth Circuit cases applied strictly as precedent, Defendant would still likely be owed qualified immunity, because an application of the legal tests used by those two circuits, the facts in this case likely would come out the other way.

need to look over their shoulders at the looming specter of personal liability, an official should be shielded from the imposition of personal liability for an honest, yet sloppy and negligent mistake made during the course of a tense and highly stressful police confrontation.

## Conclusion

Because the law was not clearly established at the time of the events in question that unintentionally but negligently discharging a lethal shotgun instead of a less-lethal shotgun violated Plaintiff's rights, Defendant is entitled to qualified immunity.  Accordingly, Defendant's Motion for Summary Judgment (Qualified Immunity) is GRANTED, and Plaintiff's Motion for Partial Summary Judgment is DENIED.

**SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE